In re ST. JOHNSBURY TRUCKING COMPANY, INC., Debtor.

ST. JOHNSBURY TRUCKING COMPANY, INC.,
Plaintiff,

v.

MORRISON–KNUDSEN COMPANY, INC., Defendant.

No. 95 Civ. 1344 (SS).
Bankruptcy No. 93 B 43136 (FGC).
Adv. No. 95/8004A.

United States District Court,
S.D. New York.

Jan. 24, 1996.

Howard J. Berman, Richard N. Tilton, Kenneth M. Lewis, John B. Hutton, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, New York City, David G. Sperry, Law Offices of David G. Sperry, Independence, Missouri, for Debtor-in-Possession, Plaintiff.

George Carl Pezold, Raymond A. Selvaggio, Sean F. Beliles, Augello, Pezold & Hirschmann, P.C., Huntington, New York, for Defendant.

Wendy H. Schwartz, Assistant United States Attorney, United States Attorney for the Southern District of New York, New York City, Henri F. Rush, Ellen D. Hanson, Virginia Strasser, Theodore K. Kalick, Interstate Commerce Commission, Washington, DC, for Intervenor United States of America on behalf of the Interstate Commerce Commission.

Sara L. Chenetz, Richard Levy, Jr., Marcus Montgomery Wolfson P.C., New York City, for Intervenor The Official Committee of Unsecured Creditors of the Debtor.

Marianne Rowden, Robert L. Follick, Follick & Bessich, P.C., Huntington Station, New York, Daniel J. Sweeney, John M. Cutler, Jr., McCarthy, Sweeney & Harkaway, P.C., Washington, DC, for Amicus Curiae National Small Shipments Traffic Conference, Inc. and Health and Personal Care Distribution Conference, Inc.

Nicholas J. DiMichael, Richard D. Fortin, Karyn A. Booth, Donelan, Cleary, Wood & Maser, P.C., Washington, DC, Marianne Rowden, Robert L. Follick, Follick & Bessich, P.C., Huntington Station, New York, for Amicus Curiae The National Industrial Transportation League.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

These consolidated bankruptcy cases come before me on plaintiff's motion for a declaratory judgment holding certain provisions of the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044 (the "Rates Act")[1] to be inapplicable in a bankruptcy proceeding, or, in the alternative, unconstitutional. I am also required to determine whether to certify this decision for appeal pursuant to 28 U.S.C. § 1292(b).

For the reasons discussed, I **deny** plaintiff's motion and hold that the Rates Act is constitutional and applies to plaintiff's claims. Because these issues raise controlling questions of law as to which there could be substantial ground for differences of opinion, the immediate appeal of which may materially advance the ultimate termination of the bankruptcy proceeding, I certify this decision for interlocutory appeal.

## BACKGROUND

This is a freight undercharge case in all respects similar to the plethora of such cases filed in recent years by bankrupt trucking companies or their trustees in virtually every federal jurisdiction in the nation.

Undercharge claims are a byproduct of the turmoil attendant to the deregulation of trucking industry rates in the 1980s. They are claims for the difference between what a trucking company was legally required to charge its customers under the "filed rate" doctrine, and lower rates that were actually charged and collected during the 1980s when competition caused trucking companies to cut their rates. A substantial number of carriers did not survive in this competitive environment. The plaintiff in this action, St. Johnsbury Trucking Co., Inc. ("St. Johnsbury" or "plaintiff") is one such carrier. St. Johnsbury filed a Chapter 11 bankruptcy petition on June 15, 1993 and by June 15, 1995, the statutory deadline for the filing of undercharge claims, St. Johnsbury had sued over 400 shippers that were formerly customers. The Rates Act supplies a myriad of defenses to shippers against whom undercharge claims are brought. On April 5, 1995, I withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. 157(d), in all those cases where defendants asserted a Rates Act defense and moved for withdrawal, and consolidated those cases solely for the purposes of determining the applicability and constitutionality of the Rates Act to the undercharge claims.[2]

Plaintiff maintains that the Bankruptcy Code's anti-forfeiture provisions, which seek to protect a debtor's estate by forbidding the forfeiture of property due to the debtor's "financial condition," 11 U.S.C. §§ 363(l) and 541(c)(1), prevent shippers from relying on the Rates Act and that § 9 of the Rates Act itself evinces a Congressional intent to strip shippers of undercharge defenses when the undercharge claims are asserted in a bankruptcy proceeding. Plaintiff alternatively claims that two of the undercharge defenses which completely bar its claims are an unconstitutional taking of it's property, i.e, its undercharge claims.

## DISCUSSION

I note at the outset that at least 154 courts have considered some or all of the issues

---

1. The Rates Act has been partially codified at Title 49, United States Code. See 49 U.S.C. § 10701(f) (codifying Rates Act § 2(a)); 49 U.S.C. § 11101(d) (codifying Rates Act § 8). Sections 2(c)–(e) and 9 of the Rates Act are not codified, but are set out in the notes following 49 U.S.C. § 10701.

2. Defendants in 154 of the adversary cases filed by St. Johnsbury in the Bankruptcy Court were granted motions to withdraw the reference. I stayed further proceedings in the Bankruptcy Court with respect to them. By consent of the parties, Morrison–Knudsen Co., Inc. was designated to represent all defendants for whom the reference had been withdrawn and this decision therefore functions as a disposition for all such cases. The remaining bankruptcy cases, for which the Rates Act defenses were not invoked by defendants, were not effected by the withdrawal and stay.

raised in this case, and the bankrupt carriers have lost in all but four. All of those four decisions have now been overturned on appeal.[3] One circuit, the Eighth, had ruled on the issues presented here (in favor of the shippers) prior to the filing of briefs by the parties. *Jones Truck Lines, Inc. v. Whittier Wood Products Co.*, 57 F.3d 642 (8th Cir. 1995) ("Whittier"). While this motion was *sub judice*, five other circuits, the Third, Fourth, Seventh, Ninth and Eleventh each ruled on the applicability issue and two (the Eight and the Eleventh) ruled on the constitutionality issue, all in favor of the shippers. *Hargrave v. United Wire Hanger Corp.*, 73 F.3d 36 (3d Cir.1996) (per curiam) ("Hargrave"); *Cooper v. B & L, Inc.*, 66 F.3d 1390 (4th Cir.1995) ("Cooper"); *Lifschultz Fast Freight Corp. v. De Medici*, 63 F.3d 621 (7th Cir.1995) ("Lifschultz"); *In re Transcon Lines*, 58 F.3d 1432 (9th Cir.1995), *petition for cert. filed*, No. 95–945, ("Transcon"), and *Olympia Holding Corp. v. Power Brake Supply, Inc.*, 68 F.3d 1304 (11th Cir.1995) ("Olympia"). The Rates Act's applicability and constitutionality is one of first impression in the Second Circuit. Because I find the reasoning of the six other circuits compelling, I have adopted it in deciding this case.

Some history of Congressional and judicial action that has shaped the freight undercharge issue is useful. For most of this century, motor carrier rates were highly regulated by the Interstate Commerce Commission (the "ICC") pursuant to the Interstate Commerce Act, 49 U.S.C. §§ 10101 *et seq.* (the "ICA"). Under the "filed rate doctrine," common carriers such as St. Johnsbury were required to file their rates with the ICC and could not charge a different rate unless that rate was filed as well. 49 U.S.C. §§ 10761,

10762. In 1980, Congress passed the Motor Carrier Act (the "MCA") which was designed substantially to deregulate the trucking industry and promote competition. Pub.L.No. 96–296, 94 Stat. 793 (1980). The MCA, however, did not abolish the filed rate doctrine. Nevertheless, in response to the MCA, the ICC promulgated regulations which allowed common carriers to negotiate rates with each of their customers and thus in effect repealed the filed rate doctrine. As carriers began to fail in this new environment, bankruptcy trustees commenced undercharge claims as a means of enlarging the estate. In 1986, the ICC declared, again by administrative fiat, that undercharge claims by bankrupt carriers were barred as an "unreasonable practice." *NITL—Pet. to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, 3 I.C.C.2d 99, 1886 WL (1986), *as modified by* 5 I.C.C.2d 623, 1989 WL 24926 (1989). The ICC's approach came to an end when the Supreme Court ruled, in *Maislin Industries, U.S. Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 135–36, 110 S.Ct. 2759, 2770–71, 111 L.Ed.2d 94 (1990) that "[i]f strict adherence to §§ 10761 and 10762 as embodied in the filed rate doctrine has become an anachronism in the wake of the MCA, it is the responsibility of Congress to modify or eliminate these sections." The decision invalidated the ICC's "unreasonable practice" regulation.

The *Maislin* decision turned the trickle of undercharge suits into a torrent of litigation. Congress estimated that as of 1993, up to $32 billion in undercharge claims could be filed by bankrupt trucking firms. See H.R.Rep. No. 359, 103rd Cong., 1st Sess. 8, reprinted in 1993 U.S.C.C.A.N. 2534, 2535. Congress responded to this crisis by enacting the Rates Act.[4] The legislative history of the

---

**3.** The list of the 144 cases decided as of June 14, 1995 in favor of shippers is appended to Defendant's Memorandum of Law. The four cases decided for the carriers, two of which emanate from the same bankruptcy judge, are: *Bulldog Trucking, Inc. v. E.I. Du Pont*, 173 B.R. 517 (W.D.N.C.1994) ("Bulldog"); *E.I. Du Pont v. Cooper*, 173 B.R. 550 (W.D.N.C.1994) ("Du Pont"); *Jones Truck Lines, Inc. v. IXL Manufacturing Co., Inc.*, 172 B.R. 602 (Bankr.W.D.Ark. 1994) ("IXL"), and *Rushton v. Saratoga Forest Products, Inc.*, 172 B.R. 99 (Bankr.D.Utah 1994) ("Saratoga"). Both *Bulldog* and *Du Pont* have

been vacated by the Fourth Circuit. *Cooper v. B & L, Inc.*, 66 F.3d 1390 (4th Cir.1995). *Saratoga* was vacated by the District Court. *In re Americana Expressways*, 177 B.R. 960 (D.Utah 1995). *IXL* was overruled *sub silentio* by *Jones Truck Lines Inc. v. Whittier Wood Products Co.*, 57 F.3d 642 (8th Cir.1995).

**4.** In 1994, subsequent to the events pertinent to this case, Congress abolished the filed rate doctrine as it applies to carriers such as St. Johnsbury by enacting the Trucking Industry Regulato-

Rates Act is replete with references to bankrupt carriers and it is clear that relieving shippers of the threat of such undercharge claims is the principal aim of the legislation. The Senate Report stated:

> The bill, as reported, is intended to alleviate the freight motor carrier "undercharge" litigation crisis by establishing a procedure for resolving disputes resulting from efforts by Trustees for bankrupt motor carriers or nonhousehold goods forwarders to collect additional amounts for past transportation.

S.Rep. No. 103–79 at 1 (1993); H.Rep. 103–359 (1993) (same).

The Rates Act creates a three-tier mechanism for resolving undercharge claims. The first level is a settlement scheme requiring carriers who are "no longer transporting property" to accept from five to 20% of their claim, depending on the volume of the shipments and whether the service provided was carriage or warehousing. 49 U.S.C. § 10701(f)(1). At issue in this case is whether the words "no longer transporting property" trigger the Bankruptcy Code's anti-forfeiture language. The second level is a blanket exemption from undercharge claims for shippers that qualify as small businesses, charitable organizations or shipper of recyclable materials. 49 U.S.C. § 10701(f)(2). St. Johnsbury claims this section as it applies to shippers claiming the small business exemption constitutes an unconstitutional taking in violation of the Fifth Amendment of the U.S. Constitution. The third level provides an alternative procedure to the first two for resolving undercharge disputes arising from shipments prior to September 30, 1990 where the shipper's defense is that the filed rate was unreasonable. This provision too applies only to carriers "no longer transporting property." Rates Act § 2(e)(1) (not codified). St. Johnsbury claims this section also steps afoul of the Takings Clause.

### DISCUSSION

I turn first to the interplay between the Rates Act and the Bankruptcy Code's anti-

forfeiture provisions. The pertinent Bankruptcy Code language states that:

> an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in ... applicable nonbankruptcy law ... that is conditioned on the insolvency or financial condition of the debtor ... and that effects ... a forfeiture....

11 U.S.C. § 541(c)(1).[5]

■ St. Johnsbury contends that the Rates Act is an "applicable nonbankruptcy law" that effects a forfeiture of its undercharge claims by conditioning them on its "financial condition," i.e., the fact that it is "no longer transporting property." Pl.'s Mem. of Law at 15. A corollary to this argument is that undercharge claims are in fact "property" as contemplated in the anti-forfeiture provisions. Defendant and amici argue that the "financial condition" predicate is not satisfied by a trucking company's mere cessation of operations. Def.'s Mem. of Law at 29–32; Mem. of Law of U.S. at 17–20. They also assert that the Rates Act only diminishes the value (rather than causes a forfeiture) of St. Johnsbury's undercharge claims. Alternatively, they argue such claims are only regulatory causes of action and not "property" at all. Def.'s Mem. of Law at 26–29; Mem. of Law of U.S. at 13–17.

All six circuits to rule in this area addressed the issue of the Bankruptcy Code's anti-forfeiture language as it applied to one or another of the undercharge defenses and ruled that the Rates Act does not work a forfeiture. Those courts have held the undercharge defenses created by the Rates Act are not "conditioned on the insolvency or financial condition of the debtor" by virtue of the prerequisite that they can be asserted only by carriers "no longer transporting property." I find their reasoning persuasive. A carrier need not be bankrupt to be "no longer transporting property" and a carrier that is bankrupt can still (if it is in Chapter

---

ry Reform Act. Pub.L. No. 103–311, §§ 201–212, 108 Stat. 1683.

5. Similar language appears at 11 U.S.C. § 363(*l*), giving the trustee the power to dispose of such debtor assets notwithstanding applicable nonbankruptcy law.

11) be transporting property. The Eighth Circuit stated:

> The distinction between operating and nonoperating carriers is a sensible one that furthers the [Rates Act's] purpose. Carriers which are still operating, whether bankrupt or not, have an incentive to maintain good relations with their customers and are less likely to file undercharge claims. Regardless of their financial condition, nonoperating carriers have no such incentive and seem much more likely to pursue undercharge claims. Congress knew in fact that some carriers had ceased operations solely in order to file undercharge claims.

*Whittier,* 57 F.3d at 649 (citation omitted). *Accord, Cooper,* 66 F.3d at 1398 ("That many nonoperating carriers seeking undercharges are in bankruptcy does not render the distinction Congress chose, between operating and nonoperating carriers, meaningless."); *Transcon,* 58 F.3d at 1440 ("The term 'financial condition' represents a concept that is somewhat broader than operational status ... because of the unusual nature of the motor freight industry that existed before enactment of the [Rates Act]...."); *Olympia,* 68 F.3d at 1307–08 (same) (citing *Whittier, Cooper,* and *Transcon*); *Hargrave,* 73 F.3d at 36 (adopting *Lifschultz*).

The Fourth Circuit opinion adds an additional reason:

> [T]he filed rate doctrine is meant to prevent discriminatory pricing and to promote reasonable rates. *Maislin,* 497 U.S. at 116, 110 S.Ct. at 2760–61. By limiting the applicability of certain provisions of the Rates Act to claims of carriers no longer transporting property, Congress has determined that those concerns no longer apply to nonoperating carriers and therefore there is no need strictly to apply the filed rate requirement to such carriers.

*Cooper,* 66 F.3d at 1398.

Because I hold that the § 541(c)(1) and § 363(*l*)'s anti-forfeiture proscriptions are not triggered by the Rates Act, I need not reach the issue of whether the undercharge claims are "property" within the meaning of those sections.

■ I next turn to the issue of Section 9 of the Rates Act, captioned "Limitation on Statutory Construction," which reads in relevant part:

> Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of Title 11, United States Code, relating to bankruptcy, Title 28, United States Code, relating to jurisdiction of the United States (including bankruptcy courts) or [ERISA].

49 U.S.C.A. § 10701 (Note).

St. Johnsbury cites this language in support of its claim that, notwithstanding the legislative record regarding bankrupt carriers, Congress intended that the undercharge defenses afforded by the Rates Act should not apply when used against bankrupt carriers. Pl.'s Mem. of Law at 25.

Plaintiff concedes that "[t]he legislative history ... makes it clear that bankrupt carriers were the principal target of the legislation." *Id.* at 26, 30. But it argues that "Congress severely compromised" that goal by enacting Section 9. *Id.* I agree with plaintiff that the Section 9 language on its face presents a potential ambiguity when read alongside the anti-forfeiture provisions of the Bankruptcy Code. I nevertheless agree with the two Courts of Appeal (and approximately 50 lower courts) that have exhaustively reviewed the legislative record and relevant case law and concluded that Congress could not have intended to create an edifice of adjudication—primarily for claims emanating for bankrupt carriers—only to shatter it with the language of Section 9. *Lifschultz,* 63 F.3d 624–29; *Whittier,* 57 F.3d at 645–47.[6] The *Lifschultz* court concluded that "a broad reading of Section 9's reference to the application of the Bankruptcy Code would all but eviscerate the [Rates Act]." *Id.* at 629. The *Whittier* court further held that "[s]tatements during the House floor debate indicate that § 9 was not

---

6. The Ninth Circuit found it unnecessary to search the legislative record, opining that the language was unambiguous. *Transcon,* 58 F.3d at 1438.

meant to exempt bankrupt carriers from the provisions of the [Rates Act]." *Id.* at 646.

Plaintiff relies principally on the exchange of letters between Congressman Jack Brooks, chair of the House Committee on the Judiciary (which has jurisdiction over the Bankruptcy Code) and Congressman Norman Mineta, chair of the Committee on Public Works and Transportation, and the leading sponsor of the Rates Act. Congressman Brook's letter noted his right to demand that the bill which became the Rates Act, H.R. 2121, be approved by the Judiciary Committee. House Report 103–359, p. 16. Congressman Minetta's letter memorialized his agreement with Congressman Brooks that with the addition of Section 9, no such approval would be required. House Report 103–359, pp. 16–17. The *Lifschultz* and *Whittier* courts considered the impact of these letters. I agree with the reasoning and conclusions reached by the *Lifschultz* court. After acknowledging the muddled state of the legislative history, *Lifschultz*, 63 F.3d at 626, it held:

> [W]hen forced to choose between specific substantive provisions and a general savings clause, we choose the more specific provisions because we believe they express congressional intent more clearly.

*Lifschultz*, 63 F.3d at 628 (citations omitted).[7]

█ St. Johnsbury makes a final argument, that the exemption from undercharge claims afforded by Sections 2(a) and 2(e) of the Rates Act is an unconstitutional taking in violation of the Fifth Amendment's Taking Clause.[8] St. Johnsbury protests that these two sections, as distinct from the other un-

dercharge defenses, "destroy the entire economic value of St. Johnsbury's undercharge claims" against small shippers and for claims accruing prior to September 30, 1990. Pls.' Mem of Law at 31. Indeed they do. One must bear in mind, however, that what is at issue is not the entire payment due plaintiff for its trucking services, but rather the difference between what St. Johnsbury itself negotiated with the shippers it is now suing and what is allegedly due under the filed rate doctrine.

As a matter of law, the question of whether a regulatory action rises to the level of an unconstitutional taking is governed by the three-part test enunciated in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) and refined in *Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).[9] The *Whittier* court analyzed the takings issue raised by St. Johnsbury in light of *Connolly* and I agree with its analysis. *Whittier*, 57 F.3d at 650–51. *Connolly* held that Congress has the freedom to "adjust the benefits and burdens of economic life to promote the common good." *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026. That is what Congress did by enacting the Rates Act.

A subsidiary issue for my resolution concerns referral of certain factual issues to the ICC. Having decided that the Rates Act is applicable, referral is not, in most instances, discretionary with either the District Court or the Bankruptcy Court. Administrative rulings by the ICC on the industry-specific fact issues presented by rate undercharge

7. The *Whittier* court concluded that the letters were intended merely to clarify jurisdiction:

> The comments of Congressman Brooks make clear that § 9 was a response to concerns that portions of the [Rates Act] would transfer jurisdiction over bankrupt carriers to the ICC.

*Whittier*, 57 F.3d at 646 (citations omitted). This is the view urged by the United States in this case. Mem. of Law of U.S. 22–25. The record is not so free from doubt. Regrettably, it is sometimes the case that Congress, in its haste to resolve policy disputes (or turf battles), leaves in its wake the detritus of compromise, a porous and contradictory record. Such is the case here.

8. The United States argues that the proper venue for review of the takings claim issue is the Court

of Federal Claims, pursuant to the Tucker Act. 28 U.S.C. § 1491(a)(1) and *Preseault v. ICC*, 494 U.S. 1 [110 S.Ct. 914, 108 L.Ed.2d 1] (1990). Mem. of Law of U.S. at 26 n. 17. The Government fails to mention that this Court has concurrent jurisdiction for takings claims under $10,000. 28 U.S.C. § 1346(a)(2) (the "Little Tucker Act"). Since the record makes no assertion that St. Johnsbury is abandoning claims for less than $10,000, I reach the merits. The Eight Circuit came to the same conclusion. *Whittier*, 57 F.3d at 650 n. 9.

9. Because of the absence of Second Circuit law on the issue, I presume, without deciding, that the undercharge claims are "property" within the meaning of the Fifth Amendment.

cases are an integral part of the adjudicatory scheme embodied by the Rates Act.

The Rates Act commits to the court in which the claim is brought the threshold determination as to whether a carrier is "no longer transporting property." 49 U.S.C. § 10701(f)(1)(A). There is no dispute as to the fact that St. Johnsbury falls into the "no longer transporting property" category.

In withdrawing the reference, I designated this case as the "lead case" and asked the defendant herein to brief the factual issues as they pertained to itself and three other defendants whose fact patterns, in the aggregate, encompass all the cases for which the reference has been withdrawn.[10]

■ St. Johnsbury's complaint seeks recovery of alleged undercharges attributable to 354 shipments that it carried for Defendant between June 1990 and April 1993. Defendant opposes collection on the grounds that *inter alia*, (1) some or all of the shipments moved in interstate commerce, thus triggering the Rates Act defenses; (2) the filed rates were "unreasonable"; (3) it is entitled to settle at the percentage levels codified by Section 2(a) of the Rates Act; and (4) collection of the undercharges attributable to shipments prior to September 30, 1990 is barred as an "unreasonable practice" pursuant to Section 2(e). Another defendant in the consolidated cases before me, *Monsanto*, also raises the additional defense that the defendant's shipments moved as "contract carriage" to which the filed rates did not apply. The Rates Act requires that all of the these issues be referred to the ICC for resolution. 49 U.S.C. § 10701(f)(5) (determination of interstate shipment); 49 U.S.C. § 10701(f)(6) (ICC decides reasonableness of filed rate); 49 U.S.C. 10701(f)2–4 (Section 2(a) disputes "shall be resolved" by the ICC); 49 U.S.C. 10701 (Note), Rates Act § 2(e)(2) (ICC has jurisdiction over unreasonable practice claims); 49 U.S.C. 11101(d) (ICC "shall have jurisdiction to, and shall resolve" disputes concerning contract vs. common carriage). Even if the Rates Act did not mandate referral of these issues to the ICC,

however, I would exercise my discretion pursuant to the doctrine of primary jurisdiction to allow defendants the opportunity to seek determination of these factual issues which are within the ICC's competence. *Reiter v. Cooper,* 507 U.S. 258, 268–69, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993).

■ Another case before me, *M & B,* turns on the defendant's eligibility for classification as a "small business" which affords it a blanket exemption. 49 U.S.C. § 10701(f)(9)(A). There is no language in the Rates Act addressing the proper jurisdiction for resolution of this issue, but I believe it is also best resolved by the ICC and exercise my discretion to refer this issue to the ICC as well.

After the close of briefing, one defendant for whom the reference had been withdrawn belatedly raised a new defense: that undercharge claims on intrastate shipments, which do not fall within the Rates Act's ambit, should also be foreclosed pursuant to Title IV of the Federal Aviation Administration Authorization Act of 1994, Pub.L. 103–305. This and any other remaining issues require further briefing.

I will hold a conference on March 8, 1996 at 3:30 to hear arguments on any other issues the parties deem to be outstanding in light of this Opinion. One week prior to that conference the parties shall file with the Court a summary (not to exceed three single-spaced pages) of any issues that require further action by this Court. The parties should address the issue of which forum is the proper one for the resolution of these remaining issues and whether I should continue to stay further proceedings on these cases, either in the Bankruptcy Court or the ICC, pending the outcome of an interlocutory appeal (should one be granted) to the Second Circuit. Defendants and the United States are invited to submit proposed orders for effectuating the decisions set forth herein as they apply to any or all of the defendants.

---

**10.** The other three are: Morrison–Knudsen (Adv. No. 95–8004A); Mac Tools (Adv. No. 95–8014A); Monsanto (Adv. No. 95–8003A) ("*Monsanto* "), and Mathews & Boucher (*M & B* ) (Adv. No. 95–8002A).

## CONCLUSION

For the reasons set forth herein, plaintiff's motion for a declaratory judgment that the Rates Act is inapplicable and unconstitutional, is **DENIED** and I certify this order for appeal pursuant to 28 U.S.C. § 1292(b).

**SO ORDERED.**