In re INDUSTRIAL FREIGHT
SYSTEM, INC., Debtor.

Duke SALISBURY, Chapter
7 Trustee, Plaintiff,

v.

S.B. POWER TOOL, A DIVISION OF
ROBERT BOSCH, Defendant.

Duke SALISBURY, Chapter 7 Trustee of
the Bankruptcy Estate of Industrial
Freight System, Inc., Plaintiff,

v.

BARNETT, INC., dba Barnett Brass
& Copper, Defendant.

Bankruptcy No. LA93–41245.
Adv. Nos. LA–95–03450–ER,
LA–95–04018–ER.

United States Bankruptcy Court,
C.D. California.

Jan. 24, 1996.

Joseph L. Steinfeld and Joseph A. Hess of Shawn, Mann & Niedermayer, L.L.P., Washington, DC, for the Trustee.

Richard H. Streeter of Barnes & Thornburg, Washington, DC, Geoffrey L. Bryan of Akre, Bryan & Chang, Los Angeles, CA, for S.B. Power Tool.

Mark A. Dickerson, Pleasant Hill, CA, for Barnett, Inc.

## MEMORANDUM OF DECISION

ERNEST M. ROBLES, Bankruptcy Judge.

On December 11, 1995, this court heard argument on the motion brought by S.B. Power Tool, a division of Robert Bosch ("S.B. Power") for partial judgment on the pleadings pursuant to Federal Rule of Bankruptcy Procedure 7012 dismissing certain counts of the complaint[1] filed by Duke Salisbury, the chapter 7 trustee ("Trustee") of debtor Industrial Freight System, Inc., ("Industrial Freight"). For the reasons set forth below, the motion is granted.[2]

### I.

### PROCEDURAL HISTORY

Industrial Freight was an intrastate and interstate freight carrier organized in Cali-

---

1. S.B. Power states, without opposition from the Trustee, that the Trustee's complaint "seeks to collect $901,756.62 of alleged freight undercharges. Of that amount, all but $6,273.41 involves intrastate shipments. As reflected by the face of the Complaint and the attachments thereto, the Trustee's Complaint is predicated on the assumed viability of provisions of the California Public Utility Code which served to enact the filed rate doctrine, namely Cal.Pub.Util.Code §§ 494, 3662, 3664 and 3667." Memorandum in Support of Motion for Partial Judgment on the Pleadings Pursuant to Bankr.Rule 7012(c) at 2.

2. The defendant in Duke Salisbury, Chapter 7 trustee v. Barnett, Inc., dba Barnett Brass & Copper ("Barnett"), Adv. No. AD 95–04018–ER, filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (FRBP 7012(b)). Since that motion is predicated upon the same basic set of facts and issue of law as S.B. Power's motion this Memorandum of Decision will apply to that motion as well.

fornia. Industrial Freight filed its chapter 11 petition on August 31, 1993, and voluntarily converted the case to a chapter 7 case on March 11, 1994. In numerous adversary proceedings factually indistinguishable from the one at issue here, the Trustee seeks to obtain from S.B. Power the difference between the amount Industrial Freight collected from it and the rate established through Industrial Freight's published tariff, the so-called "filed rate" (the "Undercharge Action".)

## II.

## ISSUE PRESENTED AND SUMMARY OF DECISION

The issue before the court is whether the application of Title VI of the Federal Aviation Administration Authorization Act of 1994, Pub.L. No. 103–305, 108 Stat. 1605 (1994) (the "Act") bars the Trustee's Undercharge Action. S.B. Power argues that the plain language of the Act precludes the enforcement of any state law "related to a price, route, or service of any motor carrier ... with respect to the transportation of property," and that the Trustee's Undercharge Action is such an attempt at enforcement. The Trustee contends, among other things, that the Act does not preclude his Undercharge Action, because it stems from Industrial Freight's carriage of cargo before the January 1, 1995 effective date of the Act.[3]

For the reasons set forth in greater detail below, the Court determines that the Act's application is neither expressly nor impliedly limited to situations in which the carriage of goods occurred after the Act's effective date, and that accordingly the Trustee's Undercharge Action is barred by the Act. S.B. Power is entitled to the entry of a judgment on the pleadings to the extent the Trustee's complaint relates to intrastate shipments because only the negotiated freight charges

apply and these charges were previously collected by Industrial Freight.

## III.

## DISCUSSION

A. *The Act and S.B. Power's "Plain Meaning" Argument.*

S.B. Power relies principally upon a plain reading of the Act, and that is where we begin our analysis. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Id.* at 242, 109 S.Ct. at 1031 (citation omitted)). The Act provides in relevant part:

> ... a State, political subdivision of a State, or political authority of 2 or more States may not enact *or enforce* a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property.

*Id.* at section 601(c) (emphasis added).[4]

As to its effective date, the Act provides:

> This section and the amendments made by this section shall take effect on January 1, 1995; except that with respect to the State of Hawaii the amendment made by subsection (c) shall take effect on the last day of the 3–year period beginning on the date of enactment of this Act.

*Id.* at section 601(d).

S.B. Power argues that the statute clearly forecloses the enforcement of any state law affecting price charged by a motor carrier after January 1, 1995. As a matter of record, the instant complaint was filed after the effective date of the Act. The Trustee's Undercharge Action, S.B. Power argues, is ex-

---

**3.** The parties agree that the Act constitutes a law related to the prices, routes, and services of motor carriers. *See* "Plaintiff's Opposition to Defendant's Motion for Partial Judgment on the Pleadings" ("Trustee's Opposition") at 1, and S.B. Power's "Reply Memorandum in Support of Motion for Partial Judgment on the Pleadings

Pursuant to Bankr.Rule 7012(c)" ("Reply Memo") at 3.

**4.** Section 601(c) of the Act is codified at 49 U.S.C. section 11501(h). Section 601(d) of the Act is not codified.

actly the "enforcement" precluded by the Act.

### B. Trustee's Arguments.

The Trustee advances several overlapping arguments for why the apparently clear terms of the Act do not preclude his Undercharge Action. The Trustee contends: 1) based upon *Landgraf v. USI Film Products,* — U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (*"Landgraf"*), as well as the provisions of the Act, the Act cannot retroactively preempt the filed rate doctrine and the Undercharge Action; 2) the Act applies only to carriers actively engaged in business; 3) the Act prohibits only state enforcement of the doctrine—not enforcement by a federal court. In addition, the Trustee argues that if this court finds that the Act does preempt the instant Undercharge Action, the court should deem his complaint amended to state a claim for breach of contract.

Although some of the issues the Trustee raises are complex, none of his arguments are ultimately availing.

#### 1. Retroactivity.

##### (a) Landgraf Does Not Support The Trustee's "Retroactivity" Argument.

Relying upon *Landgraf,* the Trustee argues that the Act applies only to bar enforcement of the filed rate doctrines of the various states with respect to carriage completed *after* its January 1, 1995 effective date. Here, the carriage took place prior to January 1, 1995, but the attempt at enforcing the state statute—the Trustee's filing of suit— took place after the effective date. Therefore, according to the Trustee, the Act cannot apply "retroactively" to bar his cause of action unless the Act provides, either specifically or through its legislative history, for such retroactive effect. The Trustee is incorrect.

*Landgraf* involved a sexual harassment case that had been tried, dismissed, and was on appeal at the time relevant amendments were enacted. The case had been filed on July 21, 1989, and a bench trial ensued in which the court dismissed plaintiff's complaint. The court found that plaintiff had been sexually harassed, and that she had suffered mental anguish, but that she had not been constructively discharged. Accordingly, because relevant law at the time of the trial only authorized equitable relief (and not damages), the court dismissed her complaint. *Landgraf,* — U.S. at ——, 114 S.Ct. at 1488. On November 21, 1991, while the plaintiff's appeal was pending, the President signed into law the Civil Rights Act of 1991, which provided, among other things, a right to recover compensatory and punitive damages for intentional discrimination, and for a jury trial. The amendments did not explicitly provide that they were retroactive nor was their legislative history instructive as to the retroactive effect of the amendments on pending cases such as Landgraf. The simple issue in *Landgraf* was whether these amendments would apply to a case on appeal when the case had been filed prior to the effective date of the amendments. *Id.* at ——, 114 S.Ct. at 1489. The Court decided that the amendments did not so apply, citing among other things a general presumption against retroactivity absent clear congressional intent. *Id.* at ——, 114 S.Ct. at 1505.

Based on *Landgraf,* the Trustee argues as follows: (i) the undercharge claims "accrued on the date each shipment moved" (Trustee's Opposition at 7); (ii) under *Landgraf,* this court must hold that the Act "has a retroactive effect on those claims" (*id.* at 3); and (iii) the Act must expressly provide for such retroactivity or the presumption against retroactivity must apply.[5] The Trustee concludes, since the Act does not explicitly provide for retroactive effect, it cannot preempt his Undercharge Action.

■■■ Contrary to the Trustee's assertions, *Landgraf* is readily distinguishable from the instant case. Here, no case was filed (let alone decided at the trial court

---

5. The Trustee primarily relies on one passage from the opinion, which states in part that "[w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Id.* at

—— , 114 S.Ct. at 1505. As the *Landgraf* court recognized, however, this concept does not overrule the general principle that a court should "apply the law in effect at the time it renders its decision." *Id.* at ——, 114 S.Ct. at 1501.

level) before the effective date of the statute. Viewed properly, there is no "retroactivity" issue created by the Act in this case. The Trustee improperly seeks to expand *Landgraf* to include not only cases that had been filed *prior* to the effective date of a statute, but also those filed *after* the effective date. His argument has merit only when the retroactivity of a statute is called into issue vis-a-vis a pending case. *Landgraf* itself makes this clear when it states that a court, in deciding the retroactivity issue, must "evaluate each provision ... in light of ordinary judicial principles concerning the application of new rules to pending cases and pre-enactment conduct." *Id.* at ——, 114 S.Ct. at 1505. *See also Chenault v. United States Postal Service*, 37 F.3d 535, 539 (9th Cir. 1994) (analyzing the retroactivity of a statute enacted during the pendency of a case in light of *Landgraf*; and noting that "[r]egardless of whether a statute is 'substantive' or 'procedural,' it may not apply to cases pending at the time of enactment if the new statute would prejudice the rights of one of the parties").[6] The *Landgraf* decision itself noted that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment ... or upsets expectations based in prior law." *Id.* at ——, 114 S.Ct. at 1499 (citations omitted).[7]

This court finds that because the Trustee filed this adversary proceeding after January 1, 1995, it was based in part upon state legislation that had already been preempted by the Act. The Trustee's "retroactivity" argument is a red herring.

(b) *The "Plain Language" Of The Act Fails To Support The Trustee's "Prospective Effect Only" Argument.*

▮▮▮ In an argument related to the "retroactivity" argument described above, the Trustee seizes upon the "shall take effect upon January 1, 1995" clause of the Act to mean that the statute applies only to conduct (carriage) occurring after January 1, 1995. In other words, the Trustee argues that by its terms the Act only applies to enforcement actions pertaining to conduct after the Act's effective date.

The effective date clause of the Act helps the Trustee only if he is correct that the conduct prohibited by the statute after January 1, 1995 is the enforcement of the filed rate doctrine with respect only to carriage occurring after January 1, 1995. The Act is not so limited, however, and there is no ambiguity in the Act on this point. By its terms, the Act precludes any enforcement of the filed rate doctrine after January 1, 1995, regardless of when the underlying conduct took place. Where there is no ambiguity in the plain terms of a statute, the court will not create one. *Garcia v. U.S.*, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984) ("When we find terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances'." (Citations omitted).) What the statute clearly prohibits is the enforcement of "... a law, regulation, or other provision having the force and effect of law related to a price." The enforcement action here is the Trustee's Undercharge Action, not the carriage of the goods.

The fact that the Act was enacted on August 23, 1994, but had an effective date of January 1, 1995 (except as to Hawaii) does not help the Trustee. It is clear that the breadth and scope of the Act required a period of adjustment for states that had previously regulated carriers (California includ-

---

**6.** The Trustee asserts that the Act is substantive and not procedural, and for this reason he is entitled to the presumption against retroactivity. Trustee's Opposition at 16. The whole discussion is beside the point. The distinction between procedural and substantive effect of a statute only comes into play when deciding the application of a statute to a pending case and pre-enactment conduct that is somehow related to a pending case. The distinction, therefore, has no application to this case. Whether the Act is procedural or substantive in nature, it is simply not retroactive for our purposes.

**7.** The discussion of "vested rights" in *Landgraf* is not to the contrary. Nothing in *Landgraf* implies that a vested right occurs immediately upon a party's conduct. Indeed, a cause of action is not necessarily even a "vested right." *See Hammond v. United States*, 786 F.2d 8 (1st Cir.1986) (vested right did not exist until a final unreviewable judgment was obtained.)

ed). It requires a leap in logic, though, to conclude that this four month period has any impact on the "enforcement" provision of the Act. The Act impliedly required the California Public Utilities Commission ("CPUC") to determine which of its numerous regulations would be affected by the Act. The four month period allowed the CPUC to make this determination.

(c) *The Views Of The CPUC Do Not Require That The Court Adopt The Trustee's "Prospective Effect" Argument.*

■ The CPUC apparently agrees with the Trustee that the California filed rate doctrine still applies with respect to carriage completed before the Act's effective date. For example, CPUC Finding 24 as set forth in its October 26, 1994 Resolution TEA-2 ("Resolution") states: "Due to the federal preemption, the Commission should cancel all carrier tariffs for Deregulated Carriage on file on the effective date of PL 103–305. Such tariffs previously filed with the Commission will no longer set the legal rate. This cancellation shall not affect the applicability of these tariffs to events occurring before PL 103–305 becomes effective." *See* Trustee's Opposition at Appendix 1, p. 19.

The views of the CPUC might be accorded some weight if its conclusion, contained in the Resolution cited above, were reasoned and involved an ambiguous statute. *Equal Employment Opportunity Commission v. Commercial Office Prods. Co.,* 486 U.S. 107, 108, 108 S.Ct. 1666, 1667–68, 100 L.Ed.2d 96 (1988) (Court finds that an agency having primary enforcement responsibility is entitled to deference where it is reasonable in interpreting ambiguous statutory language.) Neither is the case here.

After oral argument on this motion, the CPUC filed with the court an excerpt from hearings held before the Subcommittee on Surface Transportation.[8] The court has reviewed this excerpt and finds that it provides no support for the CPUC's position. Be-

cause of the total absence of any considered basis regarding why it adopted a position at odds with the Act, the Act's legislative history (as further discussed below), and the Supremacy Clause, the CPUC's views will not be accorded any weight in the court's conclusion. The enforcement of the filed rate doctrine by the CPUC is precluded by the Act, whenever the carriage occurred.

2. *The Trustee's Argument That The Act Only Applies To Carriers Currently In Business Is Not Supported By Either The Language Of The Act Or The Legislative History.*

■ The Trustee argues that the Act was intended to reach only active carriers, not defunct carriers such as Industrial Freight. Industrial Freight has not moved freight since shortly after the case was converted to chapter 7.

First, this Court must consider the plain language of the statute. The statute by its terms does not limit the enforcement of the filed rate doctrine only in cases involving active carriers; by its terms, it makes no distinction between inactive and active carriers. If Congress had intended to make a distinction between active and defunct carriers, it surely could have drafted such a distinction into the statute. The Act by its terms precludes "*any* enforcement."

Even if the court were to consider the Act's legislative history, such history is of no help to the Trustee. The legislative history of the Act is replete with statements concerning the "leveling of the playing field" and the need for deregulation of motor carriers. As stated in House Conference Report No. 103–677 ("Conference Report"):

State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets ... Lifting of these antiquated controls will permit our transportation companies to freely compete more efficiently and provide quality service to their customers. Service op-

---

8. *See* Legislation to Preempt State Motor Carrier Regulations Pertaining to Rates, Routes, and Services: Hearings Before the Subcommittee on Public Works and Transportation, 103rd Con-

gress, 2d. Sess. 103–80 (1994) (Testimony of the Honorable Bill Emerson, a Representative in Congress from Missouri).

tions will be dictated by the marketplace; and not by an artificial regulatory structure.

H.R.Conf.Rep. No. 103–677, 103rd Cong., 2nd Sess.1994, 1994 U.S.C.C.A.N. 1715.

Such statements do indicate that the purpose of the legislation was to effect efficiencies in on-going motor carrier activities; activities in which Industrial Freight no longer participates. However, the legislative history proves more than the Trustee wants. Neither the Act nor its legislative history indicates Congressional intention to limit in any way the broad scope of the statute. Specifically as to the "enforcement" clause of section 601(d), nothing presented by the legislative history indicates an intention to limit the statute's force to apply only to on-going motor activities. In fact, limiting the application of the statute to only those carriers active as of January 1, 1995, would appear to fly in the face of the comprehensive nature of the Act.

3. *The Trustee's Argument That Only State Enforcement Is Prohibited By The Act Would, If Valid, Render The Statute Meaningless.*

 Without citing any authority to support his position, the Trustee asserts that this court can expand its jurisdiction to enforce regulations related to price, even though the states are now prohibited from doing so. Trustee's Opposition at 17. In order to achieve this result, the Trustee must engage in an overly restrictive reading of section 601(c) of the Act. This court cannot enforce actions based upon the filed rate doctrine any more than the states can enforce such actions... To do so would create a judicial end-run that would render the Act a nullity. This court must read section 601(c) in a manner consistent with the purpose of the Act as a whole.

C. *The Trustee's Argument That He Should Be Entitled To Amend His Complaint Is In Substance An Attempt To Enforce The Filed Rate Doctrine.*

The Trustee argues that even if this Court should find that the Act precludes enforce-

ment of the filed rate doctrine, he should be entitled to amend his complaint to state a cause of action for breach of contract. Both the Trustee and S.B. Power cite and quote from *American Airlines, Inc. v. Wolens,* —— U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), in support of their respective positions on the contract issue: [9]

> We do not read the [Airline Deregulation Act] preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged *breach of its own, self-imposed undertakings.*

*Id.* at ——, 115 S.Ct. at 824 (emphasis added.)

Using this passage the Trustee contends that his complaint should be amended to state a common law cause of action for breach of contract, because the filed tariffs were a part of the parties' agreement as incorporated into the bill of lading. S.B. Power argues that, on this point, *Wolens* stands only for the proposition that carriers may still be sued for non-statutorily imposed undertakings, but that here there are none. It argues that as between the filed rate incorporated into the bill of lading and the negotiated price set forth therein, the court must give effect only to the negotiated rate. Reply Memo at 16. S.B. Power is correct.

 The Trustee argues that the terms and condition of Industrial Freight's tariffs "were specifically incorporated into the bill of lading contracts between [Industrial Freight] and [S.B. Power Tool]." Trustee's Opposition at 20. As a result, through the guise of a common law cause of action for breach of contract, the Trustee is attempting to resuscitate the filed rate doctrine imposed by state regulation, not its own agreement with shippers. This is what the Act specifically prohibits. Nothing in *Wolens* is to the contrary.

The Act holds carriers, whether in bankruptcy or not, and whether actively engaged

---

9. Both the Trustee and S.B. Power agree that the relevant language in the Airline Deregulation Act at issue in Wolens is identical to that in section 601 of the Act. Trustee's Opposition at 19; Reply at 14.

in business or not, to the bargains they negotiate with shippers. Industrial Freight collected the amount it bargained for from S.B. Power. The Trustee cannot receive more.

## CONCLUSION

For these reasons, both S.B. Power's motion for partial judgment on the pleadings and Barnett's motion to dismiss, are granted.[10] S.B. Power and Barnett are hereby directed to file an order consistent with this Memorandum of Decision no later than twenty days from the date set forth below.